Driskill Hotel Company v. Commissioner.
Driskill Hotel Co. v. Commissioner
Docket No. 31562.
United States Tax Court
1953 Tax Ct. Memo LEXIS 243; 12 T.C.M. (CCH) 565; T.C.M. (RIA) 53178; May 22, 1953
Ben H. Powell, Jr., Esq., 702 Brown Building, P.O. Box 63, Austin, Tex., and W. Morgan Hunter, Esq., for the petitioner. John P. Higgins, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency in petitioner's income tax for the year 1946 in the amount of $5,320. The only issue for decision is whether the payment of $14,000 by petitioner to its manager in his dismissal and termination of employment is deductible as an ordinary and necessary business expense under section 23 (a) of the Internal Revenue Code. Findings of Fact Some of the facts were stipulated and are so found. Petitioner, a Texas corporation owning and operating the Driskill Hotel in Austin, Texas, filed its *244 income tax return for the years 1946 with the collector of internal revenue for the first district of Texas. On April 1, 1944, the Driskill had been under the same ownership and management for about forty years. Stark, who had been the successful manager during all of that time, decided to retire, whereupon the owners for this reason sold all of petitioner's outstanding stock (2,000 shares) to C. R. Starnes, Herman Brown and D. C. Reed, at a price of $439.055 a share, $650,000 of the consideration being financed by a loan from a Dallas bank. The three buyers were wealthy men of varied business interests who realized the continued success of the hotel depended upon securing an experienced and competent manager, and as stockholders and also as directors of and acting for and on behalf of petitioner, as authorized by petitioner so to do, they employed Paul F. Melton, Sr., then manager of the White Plaza Hotel in Dallas, formerly assistant manager of the Adolphus in Dallas, and formerly assistant manager of the Hotel New Yorker in New York City. Melton's employment as manager was effective as of from May 1, 1944, at a salary of $6,000 per annum (later increased to $7,800 per annum) *245 plus 5 per cent of petitioner's net "earnings prior to any deductions for income taxes or depreciation", plus lodging, meals, laundry and valet services for himself and family, or in "lieu of lodging for himself and family, he be paid additional compensation of $150 per month". As a further inducement to Melton to accept the position of manager, and as additional compensation for his services as such, and contemporaneous with his employment, petitioner's directors, C. R. Starnes, Herman Brown and D. C. Reed, who owned all of petitioner's stock, agreed to give Melton an option to buy 10 per cent of the capital stock of petitioner, which oral agreement was confirmed in a letter signed by them, dated May 5, 1944, and addressed to Melton and reading in part as follows: "As stockholders and directors of the Driskill Hotel Company, we agreed, when you were employed as manager, to give you an option to acquire ten per cent (10%) of the capital stock of the Driskill Hotel Company, and this is to confirm the agreement and state the terms thereof, as follows: "We severally agree that each will sell you the following numbers of shares of stock in the Driskill Hotel Company, viz, C. R. Starnes, *246 75 shares; Herman Brown, 75 shares; and D. C. Reed, 50 shares. The price to be paid by you is the cost to us, viz, $439.055 per share, with interest from this date at the rate of four per cent (4%) per annum. "It is agreed that your five per cent (5%) of the net profits of the corporation earned by you as manager of the Driskill Hotel will be credited to your account with the Hotel and permitted to accumulate until the amount thereof is sufficient to fully pay for the stock contracted to be sold to you, together with interest as herein provided; but in the event your employment by the Company is terminated for any cause before all of said stock is fully paid for, then instead of delivering the stock, this contract of sale shall terminate, and you shall have the right to withdraw all amounts to your credit with the corporation." During Melton's tenure as manager, a "Manager's Accrued Bonus" account on petitioner's books was credited monthly with the bonus earned by Melton on the 5 per cent basis of petitioner's net earnings, which amounted to a total, for the year 1945, of $6,229.80, and for the first six months of 1946 to $3,689.77. This account was debited with cash withdrawals *247 made by Melton, and with cash expenditures for Melton's account. Melton did not allow his bonus to accumulate, but drew against his accrued bonus account for payments on his house, income taxes, insurance premiums and for cash generally. This account was also charged with 10 per cent of the interest paid to the Dallas bank on the $650,000 loan used in the purchase of the stock from the former owners. Melton's employment, on an annual basis, was for no definite term, but that both parties expected it to continue for some years is evidenced by Melton moving his family to Austin and purchasing a home there, the purchase of which petitioner helped him finance. Early in 1946 Melton's service as manager became unsatisfactory to petitioner, and in July 1946 petitioner for cause terminated his employment, after having given him six weeks previous notice of its intention so to do. Melton's separation from the service of petitioner was involuntary on his part and he demanded that he be granted severance or dismissal pay to compensate him for the wages, bonus payments, etc., due him for the remainder of the current year and also for such equity as he might have in his stock purchase agreement. *248 Petitioner's directors determined that "good business" and "good morals" demanded that he be paid reasonable compensation therefor, and Starnes, the president of and acting for petitioner, began negotiations with Melton. Petitioner first sought to settle for an amount between $8,000 and $10,000, which Melton refused to accept, and after considerable discussion at a later date, on July 25, 1946, it was mutually agreed that petitioner would pay $14,000, which was done, whereupon Melton signed a release reading in part as follows: "In consideration of the premises aforesaid and the mutual agreements herein set out, together with the payment by said Company to said Melton of the sum of $14,000.00, the receipt of which is hereby acknowledged, the said Melton has, and by these presents does, hereby release the said Company, its officers and directors, both as such and individuals, from any and all sums of money due or to become due, and any and all claims or liabilities asserted, or which might be asserted against them, or any of them, by virtue of any and all agreements, transactions, undertakings or commitments, and of all services performed by him of every nature, and does hereby declare *249 all of the same to be fully released, relinquished and extinguished." The $14,000 was paid by petitioner to Melton in the following manner: $11,379.90 thereof was paid directly to Melton and the balance, $2,620.10, was withheld and paid by petitioner to the collector of internal revenue in compliance with the Federal withholding tax provision, and later petitioner delivered to Melton a form W-2 for his income tax use which reflected this transaction as compensation paid. The payment by petitioner to Melton of the $14,000 was the result of a bona fide arm's length agreement between petitioner and Melton, and under all of the circumstances then existing was reasonable in amount, and such payment was made in discharge of an obligation by petitioner to Melton and not that of any of petitioner's stockholders or directors, all of whom, in all matters connected therewith at all times acted solely for and on behalf of petitioner, and not for their personal or individual benefit. Petitioner in its 1946 income tax return deducted, as salary paid Melton, $21,589.77. The items comprising this amount were: his 5 per cent bonus account, January to June (inclusive), $3,689.77; salary for same *250 period, $3,900; dismissal payment, $14,000. Respondent in his deficiency notice determined that the $14,000 paid by petitioner to Melton "was not an ordinary and necessary business expense of the corporation" and "therefore is not deductible for income tax purposes". The $14,000 paid by petitioner to Melton was an ordinary and necessary business expense of petitioner and is deductible. Opinion Respondent in his notice of deficiency does not specify the ground upon which he determined that the $14,000 paid by petitioner to Melton, its discharged manager, was not an ordinary and necessary business expense of petitioner. His attorney at the hearing said, "The position of respondent is that the expenditure is a capital expenditure and is not deductible as salary expense of the corporation". This position is abandoned by respondent in his brief and is not mentioned or referred to therein. Obviously, among other reasons for such abandonment is that respondent's own Regulations specifically provide that "dismissal payments" such as here involved "constitute wages". U.S. Treasury Department *251 Regulation 116, section 405.101 (e) is as follows: "Dismissal payments. - Any payments made by an employer to any employee on account of dismissal, that is, involuntary separation from the service of the employer, constitute wages regardless of whether the employer is legally bound by contract, statute, or otherwise to make such payments." On brief respondent seeks to justify his disallowance on another ground not theretofore mentioned. He there asserts that the payment of the $14,000 in question was made by petitioner to Melton for the benefit of its stockholders and not for the corporation, and was in discharge of an obligation of the stockholders to Melton rather than that of the corporation. He bases this contention on two grounds, viz: (1) That the employment contract "had no term" and hence could be terminated by petitioner at any time without liability on its part to Melton; (2) that the equity, if any, Melton had in the stock purchase agreement was based on the stockholders' agreement to sell, rather than that of the corporation, and hence they, and not the corporation, would be liable to Melton for damages resulting from its breach. Both of these grounds are in conflict *252 with the evidence and the law governing this case. As to ground 1: The employment contract was on the yearly basis, the legal effect of which is that the employment was definite for at least that period, and where the employee's duties "have been reasonably well performed", his discharge by the employer will subject the latter to payment of all compensation the employee was entitled to receive for the remainder of the current year in which the discharge took place. Dallas Hotel Co. v. Lackey, (Tex. Civ. App., 1947) 203 S.W. (2d) 557. When Melton was discharged there remained ten months of his current year of employment, during which period, under his contract of employment, he was entitled to receive as salary, bonus payments, lodging and expense allowance, an aggregate sum of $14,150. If Melton, as manager, had "reasonably well performed his services", and that is a matter a jury would have to determine if the matter were litigated, he would have been entitled to receive at least that amount, regardless of whether he sustained loss from the stock purchase agreement. If *253 petitioner in good faith decided it was good business to settle rather than to litigate Melton's claim, the payment of such claim would be a business expense, and if reasonable in amount would be deductible. From the evidence we have found that the amount of $14,000 was arrived at in a bargaining and arm's length transaction and was reasonable in amount. As to ground 2: The stock purchase agreement was entered into by petitioner's stockholders on behalf of and for the benefit of the corporation and not for themselves individually. It was not designed to and could be of no pecuniary benefit to them as individuals. It was a part of the consideration of employment and was made solely to induce Melton to accept employment. If any part of the $14,000 was paid to terminate the stock purchase agreement, it was compensation for personal services. Cf. Commissioner v. Smith, 324 U.S. 177. Furthermore, Melton failed, as the sales agreement provided, to permit his bonus payments to accumulate with which to buy the stock, but expended same for other purposes, and his equity, if any, upon termination, was negligible and under the sales contract the termination of his employment *254 terminated the sales agreement. The only case cited by respondent resembling the instant case is National Cottonseed Products Corp. v. Commissioner, 76 Fed. (2d) 839, but there the compensation in question was held unreasonable in amount. Decision will be entered for the petitioner.